## FLETCHER TRUST COMPANY v. HAUSER

[No. 15,534. Filed January 3, 1938. Rehearing denied March 10, 1938. Transfer denied May 10, 1938.]

282

*Elliott, Weyl, Jewett & Elliott,* and *Cook & Walker,* for appellant.

*Fae W. Patrick, Thomas L. Webber, Charles B. Clarke, Walter C. Clarke,* and *Charles L. Tindall,* for appellee.

CURTIS, J.—This was an action for damages sustained by the appellee resulting from alleged fraudulent acts of the appellant whereby the appellee lost a large sum of money in a real estate transaction. The controlling facts are not greatly in dispute. The cause was tried before a jury upon an amended complaint to which was addressed a general denial, resulting in a verdict in favor of the appellee in the sum of $10,500.00. The appellee filed a remittitur in the trial court in the sum of $125.00 whereupon judgment was rendered for him against the appellant in the sum of $10,375.00. The appellant seasonably filed a motion for a new trial which was overruled and that ruling is one of the alleged errors assigned in this court. Before the answer was filed the appellant demurred to the amended complaint for want of sufficient facts which demurrer

was overruled and error is also presented here on that ruling. Also to the original complaint the appellant addressed a motion, with some nine specifications to strike out parts. The complaint was then amended in the particulars complained of, by erasure and interlineations and refiled as an amended complaint. We quote from appellant's brief as follows: "While no motion to strike was addressed to the so called amended complaint, it will be recalled that there was no separate filing of the complaint as an amended complaint." The appellant is in error as to the filing of the amended complaint. The record speaks differently as follows: "Comes now the court, the plaintiff by counsel and by leave of court first had and obtained amends his complaint by erasures and interlineations to conform with rule of this court, on defendant's motion to strike out parts of plaintiff's complaint and to comply with rule of the court to file an amended complaint and said plaintiff now refiles said complaint as amended which complaint is as follows:" No errer is therefore presented for review as to the motion to strike.

We now take up the alleged errors as to the ruling on the demurrer and on the motion for a new trial. The causes in the motion for a new trial that are duly presented are that the verdict of the jury is not sustained by sufficient evidence; is contrary to law; error in the amount of the recovery in that it is too large; error as to the admission of evidence and the refusal to strike certain parts thereof, and alleged error as to the instructions given and refused.

The amended complaint is lengthy due partly to the preliminary and final contracts between the parties which contracts are made a part thereof as exhibits. We believe it would unnecessarily extend this opinion to set the amended complaint out in full. Enough of its

parts will be set out for an understanding of the opinion. Among its allegations are the following:

"That in the conduct of its said business the defendant acts as a trustee in the care, management and sale of a large number of separate tracts of real estate, both improved and unimproved, in said City of Indianapolis for the owners thereof.

"That among the unimproved tracts of real estate so conveyed to the defendant was the following described real estate situate in Marion County, Indiana, to wit: (The real estate in question)"

"That on May 15, 1925, Watson J. Hasselman and Ida B. Hasselman, his wife, conveyed the above described real estate to the Fletcher Savings and Trust Company, Trustee.

"That after said real estate had been so conveyed to said Fletcher Savings and Trust Company, Trustee, the defendant undertook to place the same on the market for sale, and solicited the aid of other agents and real estate brokers in said City of Indianapolis to find a buyer thereof; that plaintiff was approached by one of said brokers on the subject of the sale of said real estate to him, and plaintiff was solicited to make a proposition to the Fletcher Savings and Trust Company, Trustee, for the purchase of said real estate; that plaintiff was induced to make an offer to purchase said real estate, and did, in due time, in a conference with one of defendant's employees, agree orally, with said employee, as to the terms and conditions under which plaintiff would enter into a written agreement with the Fletcher Savings and Trust Company, Trustee, for the purchase of said real estate; that defendant undertook to reduce such agreement to writing and to embody therein the terms and conditions upon which the plaintiff and Fletcher Savings and Trust Company, Trustee, had agreed in such conference; that the defend-

ant did prepare a memorandum in writing for the signatures of plaintiff and the Fletcher Savings and Trust Company, Trustee, containing the terms, stipulations and conditions under which plaintiff had agreed to purchase, and the Fletcher Savings and Trust Company, had agreed to sell said real estate, and plaintiff and the Fletcher Savings and Trust Company, Trustee, thereupon executed and delivered such writing, and the same, when so executed and delivered, was in the words and figures following, to wit:

## PROPOSITION

"Fletcher Savings and Trust Company

Indianapolis, Ind., May 18, 1927.

Fletcher Savings and Trust Company, Trustee

"I hereby agree to purchase through you, the property known as Lot one hundred and ninety (190) in Hasselman Place, an Addition to the City of Indianapolis located in the City of Indianapolis, Marion County, Indiana. I hereby further agree to pay for said property the sum of Twenty-five thousand.................... ($25,000) dollars upon the following terms, viz: CASH ................ ($...............................) dollars cash to be paid upon the delivery of a good and sufficient general Trustee deed.

"It is understood that this property is to be used for the erection of an apartment building, except a business building may be erected at the west point of said lot to be of such high grade construction as will conform with that of the apartment building.

"I am to have complete possession upon date of transfer. I will assume the taxes for the year 1927 payable in 1928 and all assessments for municipal improvements completed after this date.

"That I am to be furnished free of charge an original and complete merchantable abstract of title to date, said abstract to show a merchantable or insurable title

to said real estate in the name of the grantors who will sign the deed conveying said real estate, free and clear of all liens and encumbrances except as stated herein.

"This offer is void if not accepted in writing on or before 12:00 o'clock noon of the ........ day of .................... 192.............

"It is understood and agreed that I am to have ninety (90) days in which to close this transaction and a further extension of time if necessary, such extension not to exceed ninety (90) days.

"The above agreement is conditional with the understanding that said property may be zoned for said buildings; if such zoning will not be permitted all of the monies paid shall be returned to purchasers.

E. W. HAUSER.

"As the owner of the property described herein We hereby accept this proposition this 3rd day of June, 1927.

FLETCHER SAVINGS AND TRUST COMPANY
TRUSTEE

By B. E. Richardson."

That plaintiff paid to the defendant the sum of One Thousand ($1,000.00) Dollars at the time of signing said above contract.

That the inducement and consideration which moved plaintiff to enter into such contract was the stipulation contained therein that such real estate was to be used for the erection of an apartment and business building and would be zoned for business purposes before plaintiff should be compelled to pay the full purchase price of said real estate, and that, if not so zoned for business purposes, all money paid over by plaintiff for said real estate should be returned to plaintiff.

That at the time said contract was entered into by the parties, it was understood by them that the same

would be rewritten by defendant so that payments could be made for said real estate in installments of $2,500.00 each, payable semi-annually, until the entire purchase price of said real estate, namely $25,000.00, should be paid in full, and that all other conditions for plaintiff's benefit would be included in said contract.

That plaintiff, prior to the execution of said contract, had declined to join in the execution thereof unless such contract, when finally drawn, would contain a stipulation for the payment of such purchase money in said installments and would contain the further provision for the repayment to plaintiff of all money that he may have paid for said real estate, if the same was not zoned for business purposes; that defendant, through its agent and employee, then in charge of the preparation of said contract for the signatures of the parties, proposed to plaintiff that the services of the defendant should be procured, for a consideration, to represent plaintiff in the preparation of said contract in such a manner as that it would contain said provisions for the return of the money paid for said real estate in case the property was not zoned for business purposes, and for the payment of the purchase money to the Fletcher Savings and Trust Company, Trustee, in installments of $2,500.00 each payable semi-annually.

That said defendant had theretofore held itself out to the public and this plaintiff, in advertising matter it had widely circulated to the public generally and in public prints, in newspapers and periodicals, that it would accept employment in trust capacities and supply advice and counsel, to those engaged, or about to engage, in matters of business requiring much legal knowledge and great technical skill in drafting contracts, wills and other legal documents.

That said defendant then and there represented to the plaintiff that, for the consideration asked for by

defendant, it would prepare the contract for the purchase of said real estate, in final form, so that such provisions would be contained therein for the payment of the purchase money in such installments, and for the repayment to plaintiff of all money paid over for said real estate, in the event said real estate was not zoned for business purposes.

That defendant at all times well knew that plaintiff had reposed, and in all things did repose, great confidence and trust in defendant and its agents and employees and that he would rely upon and believe any representations which defendant might make to him respecting the contents of any written instrument which defendant through its said agents and employees, might prepare for plaintiff's signature.

That on or about October 1, 1927, the agent and employee of defendant delegated by defendant to conduct the business with the plaintiff in the purchase of said real estate and to prepare a written contract for such purchase for the signature of the parties, prepared a form for such contract reading as follows: (We here omit the rather lengthy conditional sales agreement for the reason that it is in the usual printed form. No questions are directed to this contract in its general tenor. The heart of the litigation however centers around two facts connected with this contract. First it omitted entirely the provisions which were in the preliminary contract as follows:)

"It is understood that this property is to be used for the erection of an apartment building, except a business building may be erected at the west point of said lot to be of such high grade construction as will conform with that of the apartment building."

"... said agreement is conditional with the understanding that said property may be zoned for said buildings; if such zoning will not be permitted all of the moneys paid shall be returned to purchasers."

Secondly, it contained a forfeiture clause which was not in the preliminary contract. The allegations as to this forfeiture clause are in the following language.

"That such provision was not contained in the tentative contract of May 18, 1927, and had never been considered or discussed by the parties, and was never assented or agreed to by the plaintiff at any time or place, but the same was inserted in the contract as finally prepared, solely for the purpose of cheating and defrauding the plaintiff out of any interest in the property, and of all money he might invest therein."

Continuing the complaint further charges:

"That on Saturday afternoon on December 31, 1927, when banks and trust companies in the City of Indianapolis were closed for business, defendant's said agent and employee called upon plaintiff to come to the office of defendant for the purpose of executing said contract; that said agent and employee then well knew that plaintiff was very busily engaged with his work of completing a large apartment building upon which he had for some time been exclusively employed, and that he would be unable, by reason of the stress of his numerous business engagements, to give any time or attention to the examination and consideration of any contract, that might be written, and the defendant through its said agent selected the time and place best suited to carry out the wicked scheme which defendant had theretofore formed to foist upon this plaintiff a contract containing provisions detrimental to plaintiff, which he had never agreed to, and omitting other provisions, for plaintiff's benefit and protection, which both parties had not only agreed to, but had incorporated in a written instrument signed by each in good faith; that plaintiff, as requested, repaired to the office of the defendant, and was there shown two copies of a written and printed instrument in fine print purporting to be a contract; spread-out, in convenient form for signature, on the table at which said agent and employee then sat; that such agent and employee then and there falsely and fraudulently represented to this plaintiff that such paper on the table

before him was the contract which defendant had undertaken to prepare, as the vendor of said real estate, and as the agent and representative of the plaintiff; that it conformed to the requirements upon which both parties had agreed; that it contained, in particular, the provision, for the protection of plaintiff, which required the repayment to plaintiff of any part of the purchase money theretofore paid by him for said real estate, in the event the real estate described therein be not zoned for business purposes; that it would not be necessary for the plaintiff to read said contract carefully before affixing his signature to it; that he need not lose any time in examining it; that defendant, as the agent of the plaintiff, in drafting the contract had fully discharged its duties in the matter; that the contract as prepared, conformed to the requirements plaintiff had imposed for his own protection, and that any money he might pay out under the contract would be returned to him, in case the real estate described therein be not zoned for business purposes.

"That plaintiff believed such representations to be true and relied upon them in everything he then did; that he then reposed great trust and confidence in the defendant, as his agent and as the vendor of the real estate who had undertaken to reduce the agreement to writing in conformance with said prior contract and agreement, and because of defendant's high standing in the community; that, relying upon defendant's said representations and believing them to be true, and owing to the great trust and confidence reposed by him in defendant, plaintiff then signed said so-called contract while utterly ignorant of its contents; that such contract was signed by him in duplicate; that, at the request of defendant's said agent and employee, plaintiff left both copies of said contract with defendant; that no copy of such contract was ever delivered to plaintiff until on or about April 1, 1929, when he first learned that he had been deceived and betrayed, when induced by the means employed as herein alleged to sign said contract.

"That as the time of the execution of said contract, as so prepared, plaintiff paid $1,500.00 on the purchase price of said real estate, and credit was then given to him for said sum, together with

$1,000.00 paid by him at the time of the execution of said contract of May 18, 1927, as hereinbefore alleged.

"That thereafter plaintiff made two similar payments for said real estate, as they became due in semiannual periods, making the sum of Seven Thousand Five Hundred ($7,500.00) Dollars paid for said real estate and plaintiff paid taxes in the sum of Two Hundred Sixty-seven ($267.00) Dollars.

"That when Seventy-five Hundred ($7,500.00) Dollars had been paid in on said contract, and the further sum of $267.00 for taxes, plaintiff learned that said contract did not contain a provision that said real estate would be zoned for business purposes, or his money returned and that said contract did contain a provision that 'all payments (made prior to a default) . . . shall be kept and retained by the vendor,' and plaintiff then declined to make further payments on the contract.

"That at on or about the time when the last of said payments had been made by plaintiff, the strair of the business which he had been conducting terminated in a nervous breakdown, and his general health became weakened and broken down; that he was placed under the observation and in the general care of skilled physicians and surgeons; that he was taken to a hospital where he underwent a severe and serious operation, and he became so weak, sick and nervous that he was compelled to give up all his business operations and seek rest and quiet in a more congenial climate; that he was taken to Florida where he remained for many weeks sick, nervous, disturbed in mind, and disabled in body, as was well known to defendant; that he was unable to transact, and did not transact, business of any kind for many weeks.

"That while in this weak and disabled condition defendant by writing plaintiff threatening letters and by talking to him obtained from him $1,000.00 more and got him to pay $276.50 more in taxes on said real estate; that defendant then represented to him that, while said real estate had not been zoned for business purposes to date, defendant would somehow work out the matter to plaintiff's satisfaction and would get said real estate zoned for business purposes; and plaintiff, relying upon such ad-

ditional representations and believing them to be true, owing to the trust and confidence still reposed by him in defendant and its agents and employees, made such additional payments for said real estate and paid such taxes.

"That plaintiff paid to defendant Five Hundred ($500.00) Dollars, the sum agreed upon, for the services to be rendered by defendant in the preparation of said contracts.

"That on or about April 25, 1930, the defendant caused plaintiff to be notified that said real estate had not been zoned for business purposes, and that it would not be so zoned and that the money paid in by plaintiff on said real estate would not be returned to him.

"That plaintiff on or about May 10, 1932, demanded of the defendant that all sums of money theretofore paid out by him in the purchase of said real estate and in the payment of taxes thereon, together with said sum of $500.00 paid to defendant for its so called services in the preparation of said contracts, be returned to him, with the interest thereon, but defendant refused to repay said sums to the plaintiff, and said defendant now retains all money paid by plaintiff in the purchase of said real estate, with the interest thereon, under said fraudulent contract as hereinbefore alleged, and the title to said real estate is now held by the Fletcher Trust Company, Trustee, to plaintiff's damage in the sum of Fifteen Thousand ($15,000.00) Dollars."

We think that the allegations of the amended complaint are sufficient to withstand the demurrer.

We now take up the questions sought to have reviewed that are presented under the motion for a new trial.

At the beginning it may be noted that the evidence was such that the jury could properly conclude that no sufficient reason was shown for leaving out of the final contract the said important provision as to the return to the appellee of his money in case the property was not zoned for the kind of buildings he stated in his preliminary contract that he ex-

pected to erect.. It is a familiar rule of appellate procedure that on appeal this court will consider the evidence most favorable to the appellee. We quote from the appellee's brief his abstract statement of parts of the evidence. The said statement is not disputed and includes the evidence in relation to the said omission from the final. contract of the provision for the return of the appellee's money in case the property was not zoned as desired as follows: "during the year 1928 and the early spring of 1929, appellee continued to be busy in the construction of apartment buildings. On April 1, 1929, and at a time when appellee had paid to appellant $7,500.00 plus taxes, appellee called on Mr. Richardson at appellant's place of business and asked for his copy of the final contract. This was the first time that appellee had asked for the final contract, and upon looking it over he discovered that the provisions originally agreed upon the written proposition of May 18, 1927, had been omitted, and that there had been inserted in the contract certain provisions never agreed upon by the parties, namely a provision providing that in the event appellee became delinquent all payments should be retained by appellant as and for rent, and the provision that no buildings could be erected on the property without first obtaining the consent of appellant to the plans therefor. Appellee immediately accused Richardson of having defrauded him, and Richardson at that time, in appellant's place of business, denied that there had ever been an agreement providing that in case the property was not zoned all moneys paid should be returned to appellee. Appellee thereupon left, went to his office and obtained his copy of the written proposition of May 18, 1927, and returned to appellant's place of business. Upon showing Richardson the original agreement, Richardson then stated, 'Why, this agreement is out of effect, or should be,' and turned the

proposition over and wrote 'void, void, void, void, cancelled December 30, 1927.' Richardson then started to tear up the original proposition and appellee grabbed it out of his hands. This torn and mutilated document was introduced in evidence as 'plaintiff's exhibit No. 3.' Richardson then began to talk to appellee and assure him that appellant would make an effort to see what could be done about the zoning of the property if appellee would give it a little time to straighten the matters out.

"In the spring of 1929, appellee's health failed and he suffered a nervous breakdown. In the fall of 1929, he underwent a serious surgical operation, and in January of 1930, appellee was directed by his doctors to go to Florida in an attempt to recover his health. Just prior to going to Florida, he had another conversation with Richardson, who told him that if he would pay an additional $1,000.00, he thought he might be able to get Mrs. Hasselman to agree to let the property be zoned for an apartment building. Richardson obtained from appellee at that time $635.00. While in Florida, appellee did not attend to any business, and his wife, on February 11, 1930, forwarded another $500.00 to appellant. On May 1, 1930, Mrs. Hauser forwarded appellant $141.50 for taxes. Appellee returned to Indianapolis in the late spring of 1930, and in August, 1930, he again talked to Richardson and told Richardson that he had been advised to have his contract recorded, as that would be the only way he could protect what interest he had in the lot. Appellee did have the contract recorded.

"Appellee continued to be disabled and sick and did not recover and return to his work until in May, 1931, at which time Richardson told him 'he still was trying to get the Hasselmans sold on the idea that it should

be zoned for business and he hadn't succeeded up to that time.'

"In November of 1931, appellee again went to see Richardson and presented a proposition to him together with plans and specifications for the erection of a filling station upon the tract, and showed him that he had a lease signed with a party which would pay sufficient rental to make the payments required of appellee under his contract. This permission and approval of the plans were refused by appellant. Appellee thereupon demanded the return of all moneys paid under the second contract, which demand was refused."

It is brought to our attention that Richardson, the agent of the appellant, was present in the court room during the entire trial until the appellant rested its defense; that he was the only one that could have denied the truth of the appellee's testimony; that he was still in the employ of the appellant as manager of its real estate trust department; that he was not placed upon the witness stand by the appellant and that appellant's attorney who argued the case to the jury told the jurors that he would not believe Richardson even under oath. This no doubt made a profound impression upon the jury but the appellant says that we should reverse the judgment because the trial court told the jury in one of its instructions that "If you find from a preponderance of the evidence in this cause that either party hereto has failed to produce before you a witness, available and presumably favorable to such party, in explanation of any disputed transaction or controverted question in this cause, such failure to produce such witness, if any, would warrant the presumption which you are authorized to draw that the testimoney of such witness, if any, would be unfavorable to such party." In view of the situation and especially in view of the statement to the jury of the appellant's own

lawyer that he would not believe Richardson under oath, we fail to see how the appellant was injured by the instruction. The real injury to the appellant was in the fact that its own lawyer had seen fit to tell the jury that he would not believe Richardson even under oath. This, of course, left the evidence of the appellee totally undisputed insofar as it might have been disputed by Richardson. The province of this court is not to weigh the evidence. That was for the jury. By their verdict the jury resolved the evidence against the appellant. We think there was at least some competent evidence on all material allegations of the amended complaint to sustain the verdict. There has been no sufficient showing that the verdict was excessive or too large. Irrespective, then, of what our decision might be if we were permitted to weigh the evidence, the verdict must be allowed to stand unless it is one that may be said to be contrary to law or unless it was erroneously and injuriously affected by an error or errors of law occurring at the trial as complained of in the appellant's assignment of error. This brings us to a consideration of the remaining three questions; first, whether or not the verdict is contrary to law, that is, contrary to the principles of law applicable to the issues tried by the jury; second, alleged errors as to the several instructions given and refused; and third, alleged errors as to the rulings on evidence.

It is the appellant's contention in effect that although the final contract did not contain the provision for the return to the appellee of his money in case the property was not zoned as he specified in the original agreement, yet the parties dealt at arms length, so to speak, and even though the appellee was harmed thereby he cannot complain. The appellant relies upon those authorities holding that ordinarily one contracting party has no right to rely upon the state-

ments of the other as to the character or contents of a written instrument. But those authorities are not applicable where a known relation of trust and confidence exists between the parties as alleged in the complaint herein and as shown by at least some competent evidence. We think that the correct rule was announced in the recent case of *Cole* v. *McLean* (1931), 93 Ind. App. 526, 532, 177 N. E. 348, wherein it was said: "While, in the course of ordinary business transactions, men are expected to exercise reasonable prudence and not to rely upon others with whom they deal to care for and protect their interest, yet this requirement is not to be carried so far that the law shall ignore or protect positive intentional fraud successfully practiced upon the simple-minded or unwary. As between the original parties, one who has intentionally deceived the other to his prejudice is not to be heard to say in defense of the charge of fraud that the innocent party ought not to have trusted him. In Bigelow, the Law of Fraud, 525, 526, it is said: 'Every man or woman, even though illiterate, is presumed to know the contents of a written instrument signed by him; but no presumption of knowledge will stand in the way of a charge of fraud made in regard to the contents of the writing. No doubt it would be imprudent, in a sense, not to read or to require the reading of an instrument before signing or accepting it; indeed the courts would turn a deaf ear to a man who sought to get rid of a contract solely on the ground that its terms were not what he supposed them to be. But the courts would not refuse to listen, on the contrary, they would give relief, where a plaintiff charged fraud upon the defendant in reading the contract to him, or in stating its nature or terms; and also in leaving out terms agreed upon, or in inserting terms not agreed upon. This would obviously be true of cases in which the complaining party could not read or could

read only with difficulty, or in which a printed document was concerned containing much fine print. But the rule is not confined to such cases; on the contrary it is very general.'

"It has likewise been held in this state that, when one person designedly and · knowingly causes a false impression or belief to be entertained by another, and the latter is thereby induced to make a contract injurious to his best interests, such a contract is so impressed with fraud that the courts will set it aside. See *Laidla* v. *Loveless* (1872), 40 Ind. 211; *Ray* v. *Baker* (1905), 165 Ind. 74, 74 N. E. 619; *Kemery* v. *Zeigler* (1912), 176 Ind. 660, 96 N. E. 950." See also the cases of *McNair* v. *Public Savings Insurance Company* (1928), 88 Ind. App. 386, 163 N. E. 290; *Hammond Hotel, etc., Co.* v. *Perrin* (1933), 96 Ind. App. 311, 184 N. E. 906.

The appellant in its brief has confined its alleged error as to the evidence to two particulars specified as numbers 6 and 7 of the motion for a new trial. They each relate to the refusal of the court to strike out certain parts of the appellee's evidence, wherein he, while a witness, testified to certain conversations he had with Richardson as to the zoning of the property and the payment of a fee for such service. This evidence was certainly admissible as tending to explain the conduct of the parties, if for no other purpose, and it was not error to refuse to strike it out.

We have examined carefully the instructions given and those of the appellant that were refused. The court gave thirty instructions of its own motion. These instructions given by the court were full and complete and there was no error in the refusal to give the other instructions tendered by the appellant as those given fully covered the case. They were as favorable to the appellant as the law would warrant and

we find no reason to believe that the jury was, by the instructions, in any way misled to the detriment of the appellant.

Between the time of the making of the original contract and the trial below the Fletcher.Savings and Trust Company, by an appropriate proceeding, changed its corporate name to Fletcher Trust Company and this explains the difference in names used in this opinion.

No reversible error having been shown, the judgment is affirmed.